### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **KIMBERLY D. BATY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | **SA-06-CA-0475 XR (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

### MEMORANDUM AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

**TO:**  **Hon. Xavier Rodriguez**
     **United States District Judge**

## I. Introduction

Plaintiff Kimberly D. Baty seeks review and reversal of the administrative denial of her

applications for Social Security Disability Insurance (SSDI) and Supplemental Security Income

(SSI) by the defendant, the Commissioner of the Social Security Administration (SSA).  Baty

contends that the Administrative Law Judge (ALJ) erred by determining that she is not disabled.

Baty asks the Court reverse the decision denying her benefits and to render judgment in her

favor.  After considering Baty's brief in support of her complaint,[1] the brief in support of the

Commissioner's decision,[2] Baty's reply brief,[3] the record of the SSA proceedings, the pleadings

---

[1] Docket entry # 11.

[2] Docket entry # 12.

[3] Docket entry # 13.

on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's applications for benefits for disposition by recommendation.[4]

## II. <u>Jurisdiction</u>

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. <u>Administrative Proceedings</u>

Based on the record in this case, Baty fully exhausted her administrative remedies prior to filing this action in federal court.  Baty applied for SSDI and SSI benefits on September 22, 2003, alleging disability beginning April 15, 2001.[5]  The Commissioner denied the applications initially and on reconsideration.[6]  Baty then asked for a hearing.[7]  A hearing was held before the ALJ in July 2005.[8]  During the hearing, Baty amended her alleged onset date to January 15, 2002.[9]  The ALJ issued a decision on November 23, 2005, concluding that Baty was not disabled

---

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]SSA record, pp. 71 & 213.

[6]*Id*. at pp. 37, 39, 216 & 224.

[7]*Id*. at p. 246.

[8]*Id*. at p. 227-48.

[9]*Id*. at p. 251.

within the meaning of the Social Security Act (the Act).[10]  Baty asked for review of the decision

on January 25, 2006.[11]  The SSA Appeals Council concluded on April 7, 2006 that no basis

existed for review of the ALJ's decision.[12]  The ALJ's decision became the final decision of the

Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  On June

14, 2006, Washington filed this action seeking review of the Commissioner's decision.[13]

## IV.  Issue Presented

> Is the ALJ's decision that Baty is not under a "disability," as
> defined by the Act supported by substantial evidence and does the
> decision comport with relevant legal standards?

## V.  Analysis

### A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court

is limited to determining whether substantial evidence supports the decision and whether the

Commissioner applied the proper legal standards in evaluating the evidence.[14]  "Substantial

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."[15]  Substantial evidence

---

[10]*Id.* at pp. 25 & 28-36.

[11]*Id.* at p. 8-24.

[12]*Id.* at p. 4.

[13]*See* Baty's complaint, docket entry #3.

[14]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[15]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

"must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[16]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[17]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[18]  Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[19]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[20]

---

[16]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[17]*Martinez*, 64 F.3d at 173.

[18]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[19]*Martinez*, 64 F.3d at 174.

[20]*Id.*

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[21]  The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[22]  A claimant shall be determined to be disabled only if her physical or mental impairment or impairments are so severe that she is unable to not only do her previous work, but cannot, considering her age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if she applied for work.[23]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[24]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[25]

The first step involves determining whether the claimant is currently engaged in

---

[21]42 U.S.C. § 1382(a)(1) & (2).

[22]42 U.S.C. § 1382c(a)(3)(A).

[23]42 U.S.C. § 1382c(a)(3)(B).

[24]20 C.F.R. §§ 404.1520 and 416.920.

[25]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

5

substantial gainful activity.[26]  If so, the claimant will be found not disabled regardless of her

medical condition or her age, education, or work experience.[27]  The second step involves

determining whether the claimant's impairment is severe.[28]  If it is not severe, the claimant is

deemed not disabled.[29]  In the third step, the Commissioner compares the severe impairment with

those on a list of specific impairments.[30]  If it meets or equals a listed impairment, the claimant is

deemed disabled without considering her age, education, or work experience.[31]  If the impairment

is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional

capacity and the demands of her past work.[32]  If the claimant is still able to do her past work, the

claimant is not disabled.[33]  If the claimant cannot perform her past work, the Commissioner

moves to the fifth and final step of evaluating the claimant's ability, given her residual capacities,

age, education, and work experience, to do other work.[34]  If the claimant cannot do other work,

she will be found disabled.  The claimant bears the burden of proof at the first four steps of the

---

[26]20 C.F.R. §§ 404.1520 and 416.920.

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]*Id.*

sequential analysis.[35]  Once the claimant has shown that she is unable to perform her previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account her exertional and nonexertional limitations, able to maintain for a significant period of time.[36]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that she is unable to perform the alternative work.[37]

## B. Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At step one, the ALJ determined that Baty had worked since her alleged onset date, but that Baty's income fell below the threshold level for substantial gainful activity.[38]  At step two, the ALJ determined that Baty is impaired by major depressive disorder, a panic disorder and dysthymia. The ALJ characterized these impairments as severe.[39]  At step three, the ALJ determined that Baty's impairments are not severe enough to meet, medically equal or functionally equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.[40]  At step four, the ALJ determined that Baty retains the residual functional capacity to perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact

---

[35]*Leggett*, 67 F.3d at 564.

[36]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[37]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[38]SSA record, pp. 30 & 35.

[39]*Id*.

[40]*Id*.

with coworkers, supervisors or the public.[41]  He also determined that Baty has no transferrable

skills based on her residual functional capacity for simple, repetitive tasks, but that she can

perform a significant range of work at any exertional level.[42]  At step five, the ALJ determined

that Baty is capable of making a successful adjustment to work that exists in significant numbers

in the national economy.[43]  Consequently, the ALJ concluded that Baty is not disabled.[44]

**C.  Baty's Allegations of Error**

Baty complains that the ALJ erred by failing to give considerable weight to her treating

physician's opinion about her ability to work, by failing to establish the existence of jobs in

significant numbers in the economy that she can perform, and by failing to appropriately evaluate

her credibility.  She maintains that substantial evidence shows that she is disabled.

The evidence in this case came from three sources: medical records from the Center for

Health Care Services (CHCS),[45] evaluations of Baty's limitations, and testimony from the

hearing before the ALJ.  Baty's treatment records from the CHCS includes a mental residual

functional capacity questionnaire completed by Baty's treating physician, Dr. Matthew E. Levine.

In that assessment, Dr. Levine reported that Baty suffers from frequent panic attacks which cause

---

[41]*Id*. at pp. 33 & 35.

[42]*Id*.

[43]*Id*. at pp. 34-35.

[44]*Id*. at p. 35-36.

[45]The CHCS is one of 42 Community Mental Health Centers in Texas—the CHCS is located in San Antonio, Texas.  The CHCS serves persons with mental illness and mental retardation who live in Bexar County, Texas, without regard to the ability to pay for services.  *See* Ctr. for Health Care Services, Local Plan FY 2004, at pp. 9 & 13, *available at* http://www. chcsbc.org/about_us.html.

her to withdraw and avoid social contact.  In assessing Baty's limitations, Dr. Levine opined that Baty is unable to complete a normal workday and workweek without interruptions from her psychologically based symptoms and that she is unable to deal with normal work stress.  Baty relies on this assessment to support her claim that she is disabled and unable to work.  Although the assessment indicates that Baty is unable to work on a regular and consistent basis, substantial evidence supports the ALJ's decision that Baty is not disabled.

Baty's records from the CHCS indicate that Baty sought treatment for mental illness on June 25, 2003.[46]  The record for that visit suggests that Baty may have visited the CHCS before that time—the physician's abbreviated progress note for that visit states that Baty was there for a scheduled followup.  The record, however, does not contain a treatment note for a prior visit. The progress note indicates that Baty was taking Effexor for major depressive disorder and that Baty stated that she had begun to experience feelings again.   Major depressive disorder is a mental illness "marked by the occurrence of one or more major depressive episodes, in the absence of manic or hypomanic episodes."[47]  Effexor is the "trademark name of a drug used in the treatment of major depressive disorders."[48]  The healthcare professional who saw Baty refilled Baty's prescription for Effexor and directed Baty to followup with Dr. Eclarinal on July 3, 2003.

---

[46]SSA record, pp. 164-65.

[47]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. M-402 (Matthew Bender 2005).  *See* Am. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 369-76 (4th ed., text revision, 2000) (hereinafter DSM-IV-TR).

[48]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. E-673 (Matthew Bender 2005).

Baty returned to the CHCS on July 3, 2003 and saw a physician[49]—the signature on the physician's progress note is illegible so I could not confirm that Baty saw Dr. Eclarinal.  Baty told the physician that she had been served with papers for divorce, she was unemployed, she was separated from her daughter, and she lived with her mother—she was 29 years old at that time.  The physician recorded Baty's insight and judgment as excellent; the physician observed no gross cognitive deficits.  The physician diagnosed Baty as having major depressive disorder and panic disorder.

> [P]anic [d]isorder [is a] mental disorder marked by recurring attacks of panic (overpowering fright), periods of intense apprehension, unreasoning terror, fear of impending catastrophe, etc.  It is associated with physical manifestations, such as shortness of breath, palpitation of the heart, dizziness, vertigo, trembling, and faintness.  There may be a fear of dying or of losing one's mind (going crazy).  The periods between attacks are characterized by nervousness and anxiety.  Agoraphobia [fear of public places] may or may not be present.[50]

The physician increased the dosage of Baty's Effexor from 75 mg/day to 100 mg/day.

Baty returned on September 2, 2003 and saw the same physician[51]—the signature on the physician's progress note for that visit is illegible but it appears to be the same signature that is on the physician's progress note for July 3, 2003.  The physician assessed Baty's depression as a "3" on a scale of 1-10, with 0 equating to "no symptoms" and 10 equating to "extreme symptoms."  Baty reported that she was out of medication and that she could not sleep.  She told the physician that she had gotten divorced, her fiancé was away caring for his father, and she feared her fiancé might not return.  The physician decreased Baty's dosage of Effexor to 75

---

[49]SSA record, pp. 159-63.

[50]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. P-831 (Matthew Bender 2005).

[51]SSA record, pp. 153-57.

mg/day.

Baty did not return to the CHCS until January 16, 2004.[52]  By that time, Baty had applied for disability benefits.  Baty reported that she had discontinued taking her Effexor, her depression had increased, and she had begun to have panic attacks.  The health care professional who saw Baty assessed Baty's depression as "1-2" and her anxiety as "2."  The healthcare professional prescribed 75 mg/day of Effexor, 20 mg/day of Prozac and clonazepam.  Prozac is the "trademark name of a drug used as an antidepressant."[53]  Clonazepam is used to treat panic disorder.[54]  The healthcare professional instructed Baty to return in 4 weeks.[55]

Baty did not return to the CHCS until December 22, 2004—eleven months after her application for benefits was denied.  This visit was the first time Baty saw Dr. Levine.[56]  Baty reported that she had been sexually abused as a child, she used drugs in the past, she lived with her disabled mother, she had never kept a job for more than 6 to 12 months, and she was not working.  She complained about depression, mood swings, and problems with sleeping.  Dr. Levine diagnosed Baty as having dysthymic disorder and panic disorder.  Dysthymic disorder is a mood disorder, "less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more

---

[52] SSA record, pp. 148-52.

[53] J.E. Schmidt, M.D., Attorney Dictionary of Med. PR-1968 (Matthew Bender 2005).

[54] Physician's Desk Reference 2782 (Thompson PDR 60th ed.).

[55] SSA record, p. 151.

[56] Id. at pp. 199-204.

11

than two years."[57]  Dr. Levine made a global assessment-of-functioning (GAF)[58] assessment of

45.[59]  Under the GAF scale, a score of 41-50 equates to serious symptoms or any serious

impairment in social, occupational, or school functioning.[60]  An example of a serious impairment

in occupational functioning is the inability to keep a job.[61]  Dr. Levine prescribed medication as

treatment.

Baty returned to Dr. Levine the following week.[62]  She reported that she had not had any

panic attacks since her last visit.  Dr. Levine assessed Baty's depression as "1-2" and her anxiety

as "1-2."  Dr. Levine adjusted Baty's medication and instructed Baty to return in four weeks.

Baty returned on January 24, 2005,[63] and reported that she was better, but was still having anxiety

at times.  Dr. Levine assessed Baty's depression as "1" and her anxiety as "2."  Dr. Levine

refilled Baty's medication and instructed her to return in four weeks.  Baty returned two months

later.[64]  Baty appeared tearful and depressed, and complained that her sister had taken herfood

---

[57]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. D-5402 (Matthew Bender 2005).  *See* DSM-IV-TR at 379 (stating that dysthymic disorder is characterized by chronic, less severe depressive symptoms that have been present for many years).

[58]The global assessment of functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. *See* DSM-IV-TR at 32-36.  The scale is described in the DSM-IV-TR.  *See id.*

[59]SSA record, pp. 203.

[60]DSM-IV-TR at 34.

[61]*See id.*

[62]*See* SSA record, 197-9.

[63]*Id.* at pp. 195-6.

[64]SSA record, 193-4.

stamps when she moved out of her mother's house and that her live-in boyfriend contributed

nothing and refused to work.  Dr. Levine assessed Baty's depression as "4" and her anxiety as

"3."  Dr. Levine adjusted Baty's medication and instructed her to return in four weeks.

Baty returned four months later on August 2, 2005—a couple of weeks after Baty's

hearing.[65]  During that visit, Baty reported that she had been off her medication for a month until

she found a few pills.  She further reported that her panic attacks had started again, about two

weeks before.  Dr. Levine assessed Baty's depression as "2" and her anxiety as "2."  Despite this

assessment, Dr. Levine completed a mental residual functional capacity questionnaire that same

day, presenting a much bleaker picture of Baty's mental health.[66]  In completing the

questionnaire, Dr. Levine made a GAF of 46.  A GAF score of 46 falls midway within the range

for serious symptoms or any serious impairment in social, occupational, or school functioning.[67]

Dr. Levine opined that Baty's prognosis was poor due to the long duration of her symptoms, her

history of substance abuse, and poor compliance with prescribed treatment.  About Baty's mental

abilities and aptitudes to do unskilled work, Dr. Levine made the following assessments: (1)

limited but satisfactory in the ability to remember work-like procedures, (2) limited but

satisfactory in the ability to understand and remember very short and simple instructions, (3)

limited but satisfactory in the ability to carry out very short and simple instructions, (4) seriously

limited but not precluded in the ability to maintain attention for two hour segment, (5) *no useful

ability to maintain regular attendance and be punctual within customary, usually strict*

---

[65]*Id*. at p. 234–6.

[66]*Id*. at pp. 208-12.

[67]DSM-IV-TR at 34.

*tolerances*, (6) limited but satisfactory in the ability to sustain an ordinary routine without special supervision, (7) seriously limited but not precluded in the ability to work in coordination with or proximity to others without being unduly distracted, (8) limited but satisfactory in the ability to make simple work-related decisions, (9) *unable to meet competitive standards in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms*, (10) *no useful ability to perform at a consistent pace without unreasonable number and length of rest periods*, (11) limited but satisfactory in the ability to ask simple questions or assistance, (12) *unable to meet competitive standards in the ability to accept instructions and respond appropriately to criticism from supervisors*, (13) seriously limited but not precluded in the ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, (14) *unable to meet competitive standards in the ability to respond appropriately to changes in a routine work setting*, (15) *unable to meet competitive standards in the ability to deal with normal work stress*, and (16) limited but satisfactory in the ability to be aware of normal hazards and take appropriate precautions.[68]  Arguably, the italicized limitations are inconsistent with the ability to perform substantial gainful activity because it requires the

---

[68]About Baty's mental abilities and aptitudes to do semi-skilled and skilled work, Dr. Levine made the following assessments: (1) limited but satisfactory in the ability to understand and remember detailed instructions, (2) limited but satisfactory in the ability to carry out detailed instructions, (3) seriously limited but not precluded in the ability to set realistic goals or make plans independently of others, and (4) limited but satisfactory in the ability to deal with stress of semiskilled and skilled work.  *See* SSA record, p. 211.  About Baty's mental abilities and aptitude to do particular types of jobs, Dr. Levine made the following assessments: (1) limited but satisfactory in the ability to interact with the general public, (2) limited in the ability to maintain socially appropriate behavior, (3) unable to meet competitive standards in the ability to adhere to standards of neatness and cleanliness, (4) unable to meet competitive standards in the ability to travel in unfamiliar place, and (5) unable to meet competitive standards in the ability to use public transportation.  *See id*.

14

"residual functional capacity for work activity on a regular and continuing basis."[69]  Ordinarily, a

person with the italicized limitations would be unable to maintain employment on a regular and

continuous basis.  The ALJ, however, found the assessed limitations to be inconsistent with Dr

Levine's treatment notes and with other substantial evidence in the record.[70]  Baty disagrees with

this finding.

In determining whether a person is disabled, the SSA give mores weight to opinions from

a claimant's treating physicians than non-treating physicians because treating physicians are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of a

claimant's medical impairments and "may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations."[71]  If the SSA finds

that a treating physician's opinion about the nature and severity of the claimant's impairment is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

consistent with the other substantial evidence, the SSA will give the treating physician's opinion

controlling weight.[72]  When the SSA does not give the treating physician's opinion controlling

weight, the SSA will consider the following factors in determining the weight to give the

opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and

extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6)

---

[69]20 C.F.R. § 404.1545(c).

[70]SSA record, p. 32.

[71]20 C.F.R. § 404.1527(d)(2) & 20 C.F.R. § 416.927(d)(2).

[72]*See id.*

15

any other factor brought to the SSA's attention, or of which the SSA is aware, which tends to support or contradict the opinion.[73]  In this case, the length of Dr. Levine's treatment relationship and the frequency of his examination, and the consistency of Dr. Levine's treatment records with the limitations reflected on the mental residual functional capacity questionnaire, are particularly relevant.

The SSA gives a treating physician's opinion more weight than a non-treating physician's opinion if the treating physician has seen the claimant a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment.[74]  Dr. Levine indicated that he had seen Baty three times for 17-25 minutes since first evaluating Baty on December 22, 2004. Dr. Levine's treatment notes confirm this length and frequency of treatment.  Thus, the record shows that Dr. Levine had seen Baty for a little over seven months before he completed the mental residual functional capacity questionnaire.  During those seven months, Dr. Levine saw Baty four times.  A longitudinal picture of a claimant's impairments necessarily requires repeated observation or examination over time.  Four times in seven months is not enough time to develop a longitudinal picture of impairments that Baty maintains she has had for 15 years.[75]  The ALJ properly considered this factor in determining how much weight to give Dr. Levine's opinion. While the length and frequency of treatment supports the ALJ's determination not to give Dr. Levine's opinion controlling weight, the inconsistency of Dr. Levine's opinion with his treatment

---

[73]*See id.*

[74]20 C.F.R. § 404.1527(d)(2)(I) & 20 C.F.R. § 416.927(d)(2)(I).

[75]SSA record, p. 97 (Baty writing on May 31, 2004 that she has been fighting problems with anxiety and depression for almost 13 years); *id.* at p. 208 (Dr. Levine indicating that Baty has 15-year history of illness).

notes further supports the ALJ's decision.

Generally, "the more consistent an opinion is with the record as a whole, the more weight [the SSA gives] to that opinion."[76]  In this case, Dr. Levine's opinion is not only inconsistent with other evidence in the record, it is inconsistent with his own treatment notes. Prior to August 2, 2005, Dr. Levine never indicated that Baty's symptoms were so severe as to render her unable to work.  On December 29, 2004, Dr. Levine assessed Baty's depression as "1-2" and her anxiety as "1-2."[77]  On January 24, 2005, Dr. Levine assessed Baty's depression as "1" and her anxiety as "2."[78]  On March 28, 2005, Dr. Levine assessed Baty's depression as "4" and her anxiety as "3."[79]  Notably, on the day he completed the mental residual functional capacity questionnaire—on August 2, 2005—Dr. Levine assessed Baty's depression as "2" and her anxiety as "2."[80]  Even after August 2, 2005, Levine did not indicate the severity of symptoms reflected on the mental residual functional capacity questionnaire.  Four weeks later—on August 31, 2005—Dr. Levine assessed Baty's depression as "3" and her anxiety as "3."[81]  On November 16, 2005, Dr. Levine assessed Baty's depression as "1" and her anxiety as "0."[82]  In addition, Dr. Levine's diagnosis of dysthymic disorder indicates Dr. Levine considered Baty's symptoms of

---

[76]20 C.F.R. § 404.1527(d)(4).

[77]SSA record, p. 198.

[78]*Id*. at pp. 196.

[79]*Id*. at p. 194.

[80]*Id*. at p. 235.

[81]*Id*. at pp. 241-2.

[82]*Id*. at pp. 237-8.

depression to be less severe than the physicians who diagnosed Baty with major depressive disorder—a diagnosis of dysthymic disorder indicates the physician considers the patient's depressive symptoms to be less severe than those present in major depressive disorder.[83]  These assessments support the ALJ's determination that Baty retains the residual functional capacity to perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact with coworkers, supervisors or the public.  Taken as a whole, Baty's records support that determination because nothing in those records except for Dr. Levine's opinion on the mental residual functional capacity questionnaire reflects that Baty cannot perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact with coworkers, supervisors or the public.

The other evaluations of Baty's capabilities also indicate that Baty can perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact with coworkers, supervisors or the public.  For example, shortly after Baty applied for benefits, Dr. Bradford I. Brunson examined Baty at the request of the Texas Rehabilitation Commission (TRC).[84]  Dr. Brunson diagnosed Baty as having major depressive disorder, severe with mood congruent psychotic features, anxiety disorder, sexual abuse as a child, and physical abuse as a child.[85]  Dr. Brunson assessed a GAF of 55.  A score of 55 falls

---

[83]DSM-IV-TR at 379.

[84]  The TRC's Disability Determination Services "adjudicates Social Security disability claims in accordance with the Social Security Act."  *See* TEX. SERVICES: SUPP. TO THE 2000 BIENNIAL REP., TEX., COUNCIL FOR DEVELOPMENTAL DISABILITIES ¶ 1.5.1 (May 2000), *available at* www.txddc.state.tx.us, click on resources & then on biennial reports.

[85]SSA record, pp. 121-8.

midway within the range for "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."[86]  Dr. Brunson found no functional or physical problems in activities of daily living.  Dr. Brunson opined that Baty's prognosis for change with appropriate intervention was fair.  This assessment supports the ALJ's determination that Baty can perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact with coworkers, supervisors or the public because the evaluation recognizes that Baty's severe impairments due to major depressive disorder and dysthymia result in only moderate symptoms.

The following month, Dr. A. Boulous reviewed Baty's medical records and completed a psychiatric review technique form.[87]  Section III.A. of that form asks the evaluator to rate the claimant's functional limitations using the criteria for determining whether a claimant's impairments meet or medically equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  In this case, Dr. Boulous rated Baty using the criterion for section 12.04—affective disorders—and section 12.06—anxiety related disorders.[88]  Each section requires among other things at least two marked restrictions in a functional area.[89]  Dr. Boulous did not rate Baty as having a marked limitation.  Instead, he rated Baty as follows: (1) mild restriction of activities of daily living, (2) moderate in difficulties in maintaining social functioning, (3) moderate

---

[86]DSM-IV-TR at 34.

[87]SSA record, pp. 139-45

[88]*See* 20 C.F.R., pt. 404, subpt. P, appx. 1, §§ 12.04 & 12.06.

[89]*See id*.

limitation in maintaining concentration, persistence or pace, and (4) no episodes of

decompensation, each of extended duration.[90]  Dr. Boulous concluded the medical evidence did

not establish the presence the criteria for either section 12.04 or 12.06 and that  Baty's alleged

limitations due to mental symptoms are not fully supported by evidence.[91]

Dr. Boulous also completed a mental residual functional capacity assessment form.[92]

That form asked the rater to assess several mental activities within the context of the claimant's

capacity to sustain that activity over a normal workday and workweek.  None of Dr. Boulous's

ratings indicated that Baty is unable to work.[93]  Dr. Boulous assessed the same mental activities

---

[90]SSA record, p. 139.

[91]*Id*. at pp. 140-1.

[92]*Id*. at pp. 143-6.

[93]Dr. Boulous made the following assessments: (1) not significantly limited in the ability to remember locations and work-like procedures, (2) not significantly limited in the ability to understand and remember very short and simple instructions, (3) moderately limited in the ability to understand and remember detailed instructions, (4)  not significantly limited in the ability to carry out very short and simple instructions, (5) moderately limited in the ability to carry out detailed instructions, (6) moderately limited in the ability to maintain attention and concentration for extended periods, (7) not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (8) not significantly limited in the ability to sustain an ordinary routine without special supervision, (9) not significantly limited in the ability to work in coordination or proximity to others without being distracted by them, (10) not significantly limited in the ability to make simple work-related decisions, (11) not significantly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods, (12) moderately limited in the ability to interact appropriately with the general public, (13) not significantly limited in the ability to ask simple questions or request assistance, (14) moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, (15) not significantly limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (16) not significantly limited in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, (17) not significantly limited in the ability to respond appropriately to changes in the work setting, (18) not significantly limited in the ability to be aware of normal hazards and take

20

that Dr. Levine assessed, but with sharply contrasting results.  Dr. Boulous concluded that Baty retains the abilities to understand and carry out detailed noncomplex tasks, to interact with coworkers and supervisors, and to adapt to routine changes in work setting.  This assessment supports the ALJ's determination that Baty can perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact with coworkers, supervisors or the public because it recognizes that Baty has limitations that require a job with low stress and minimal contact with others.

The SSA denied Baty's applications based on Dr. Brunson's examination, so the TRC sent Baty to a second evaluator when Baty asked for reconsideration.  Gayle D. Monnig, a licensed psychologist and clinical nurse specialist, examined Baty on May 10, 2004.[94]  Monnig diagnosed Baty as having panic disorder with agoraphobia; dysthymic disorder, early onset; and cannabis abuse, full sustained remission.[95]  She assessed a GAF of 50.  A score of 50 falls at the top of the range for serious symptoms or any serious impairment in social, occupational, or school functioning.[96]  Monnig opined that Baty's prognosis was guarded.  Because the report does not assess Baty's capabilities beyond her ability to understand what it means to file for benefits and whether she can manage benefits payments, it is speculative to determine whether the report supports the ALJ's determination that Baty can perform work at any exertional level in

---

appropriate precautions, (19) moderately limited in the ability to travel in unfamiliar places or use public transportation, and (20)  not significantly limited in the ability to set realistic goals or make plans independently of others.  SSA record, pp. 143-4.

[94]SSA record, pp. 166-71.

[95]*Id*. at p. 170.

[96]DSM-IV-TR at 34.

a low stress work environment performing simple, repetitive tasks with minimal contact with coworkers, supervisors or the public. Monnig's score for GAF, however, indicates that Baty has a serious impairment in either or both social and occupational functioning.

The TRC also sent Baty's medical records to a second evaluator, Dr. M. Chappuis . At that time, Baty's records included her initial treatment records from the CHCS. Like Dr. Boulous, Dr. Chappuis reviewed the records and completed a psychiatric review technique form[97] and a mental residual functional capacity assessment form.[98] These assessments were completed on May 14, 2004. Dr. Chappuis also considered sections 12.04 and 12.06 in section III.A. Like Dr. Boulous, Dr. Chappuis did not rate Baty as having a marked limitation. Instead, he rated Baty as follows: (1) mild restriction of activities of daily living, (2) moderate in difficulties in maintaining social functioning, (3) moderate limitation in maintaining concentration, persistence or pace, and (4) no episodes of decompensation, each of extended duration[99]—the same ratings as Dr. Boulous. Thus, Dr. Chappuis concluded that the medical evidence did not establish the presence of the criteria for either section 12.04 or 12.06 and that Baty's alleged limitations are not fully supported by objective medical evidence or other evidence.[100]

None of Dr. Chappuis's ratings on the mental residual functional capacity assessment

---

[97]SSA record, pp. 177-90.

[98]*Id*. at pp. 173-6.

[99]*Id*. at p. 187.

[100]*Id*. at pp. 187-8.

form indicated that Baty is unable to work.[101]  Like Dr. Boulous's ratings, Dr. Chappuis's ratings

sharply contrast Dr. Levine's assessment of Baty's ability to work.  Dr. Chappuis concluded that

Baty can understand, remember and carry out detailed, but not complex instructions; make

decisions; attend and concentrate for extended periods; accept instructions; and respond

appropriately to changes in routine work setting.  This assessment supports the ALJ's

determination that Baty can perform work at any exertional level in a low stress work

environment performing simple, repetitive tasks with minimal contact with coworkers,

supervisors or the public because it recognizes that Baty has limitations that require a job with

low stress and minimal contact with others.

---

[101]Dr. Chappuis made the following assessments: (1)  not significantly limited in the ability to remember locations and work-like procedures, (2) not significantly limited in the ability to understand and remember very short and simple instructions, (3) moderately limited in the ability to understand and remember detailed instructions, (4) not significantly limited in the ability to carry out very short and simple instructions, (5) moderately limited in the ability to carry out detailed instructions, (6) moderately limited in the ability to maintain attention and concentration for extended periods, (7) not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (8) not significantly limited in the ability to sustain an ordinary routine without special supervision, (9) not significantly limited in the ability to work in coordination or proximity to others without being distracted by them, (10) not significantly limited in the ability to make simple work-related decisions, (11) not significantly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods, (12) moderately limited in the ability to interact appropriately with the general public, (13) not significantly limited in the ability to ask simple questions or request assistance, (14) moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, (15) not significantly limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (16) not significantly limited in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, (17) not significantly limited in the ability to respond appropriately to changes in the work setting, (18) not significantly limited in the ability to be aware of normal hazards and take appropriate precautions, (19) not significantly limited in the ability to travel in unfamiliar places or use public transportation, and (20) not significantly limited in the ability to set realistic goals or make plans independently of others.  SSA record, pp. 173-4.

The testimony during the hearing before the ALJ is a little more difficult to assess, in part, because the medical expert recommended a residual functional capacity assessment and testified without the benefit of Dr. Levine's opinion.  The medical expert, Dr. James Lazarus, reviewed Baty's records from the CHCS for the time period July 3, 2003 to November 16, 2004. Using the criteria for assessing whether a mental impairment meets section 12.04, Dr. Lazarus rated Baty as follows:(1) moderate restriction of activities of daily living, (2) moderate in difficulties in maintaining social functioning, (3) moderate limitation in maintaining concentration, persistence or pace, and (4) one to two episodes of decompensation, each of extended duration.[102]  Dr. Lazarus testified that Baty did not meet the criteria for section 12.04. Answering the ALJ about whether Baty could maintain work on a regular and sustained basis in a low stress work environment performing simple, repetitive tasks with minimal public contact, Dr. Lazarus testified that the evidence was in conflict and a residual functional capacity assessment was needed to make that determination.  Dr. Lazarus testified that Baty's pattern of playing internet video games for 8 hours a day shows persistence and an ability to concentrate, but it conflicted with her testimony that she withdrew to the bathroom during a previous job when she had a panic attack.[103]  He assessed Baty as having slight restriction in the ability to follow simple  instructions, marked restriction in the ability to follow detailed instructions, moderate in her ability to maintain attention and concentration; moderate in her ability to function independently; moderate in her ability interact appropriately with the public; moderate in her ability to interact appropriately with supervisors; moderate in the ability to interact with

---

[102]SSA record, pp. 275-6.

[103]*Id*. at p. 276.

co-workers; moderate in the ability to respond to work pressures in the usual work setting; and

moderate or marked in the ability to respond to work pressures in the usual work setting.[104]  This

evidence supports the ALJ's determination that Baty can perform work at any exertional level in

a low stress work environment performing simple, repetitive tasks with minimal contact with

coworkers, supervisors or the public.

According to Baty, however, her panic attacks prevent her from working.  During the

hearing, she testified about her various jobs and stated that she quit her last job as a dancer at a

men's club because she "completely freaked out. [She] started having panic attacks before,

during and after work."[105]  She maintains that her panic attacks have prevented her from keeping

a job for more than 6-12 months.  Answering the ALJ, Baty explained why she could not work

even if she was by herself:

> I honestly don't think I could.  Going, getting there, being stuck there for that
> amount of time, not being able to leave, this is your task, you're stuck there from
> blah to blah until we say you can leave.  That, I don't know if you want to call it
> claustrophobia or what you want to call it, but it –[106]

After Baty testified that she mowed her mother's lawn, the ALJ asked Baty what would prevent

her from working mowing lawns.  Baty answered as follows:

> The people.  The other people that weren't my family whose yards I was mowing.
> I had a, about a year ago or two years ago, I didn't have a phobia about this, but it
> happened.  A guy came to my house to survey the house for the insurance
> company and repeatedly made advances at me and touched me and grabbed my
> shirt and pulled it out and all these things.  And he worked for the mortgage
> company.  And I, before that I didn't have fear of total strangers on my property,

---

[104]*Id*. at pp. 279-81.

[105]*Id*. at p. 253.

[106]*Id*. at p. 261.

and now I'm scared of them everywhere.  If I don't know you, and especially if
you're a man, I don't put anything past you.  This person was on my land and
grabbing on me and making lewd comments and all of that.
***
And so that, I mean, there's lots of things I could try.  I wouldn't be successful.  I
would end up quitting, which is why I decided to try this.[107]

The ALJ found that Baty's assertion that she is disabled not fully credible.  As an explanation of

why, the ALJ compared Baty's allegations with her testimony about why she left various jobs.

She lost her full time job in a video store because she and her girlfriend were
sending faxes on work time, not due to panic attacks or other mental impairment.
She testified that she quit her job as a cashier [at a grocery store] in order to make
more money at a men's club, but lost her job due to anxiety and panic attacks.  I
find her testimony credible in this regard and that she could not return to that job,
but she can at least do work involving simple, repetitive tasks in a low stress
environment that involves minimal contact with others.[108]

Baty complains that the ALJ failed to consider the required factors for making credibility

determinations.

In determining whether a claimant is disabled, the SSA considers all of the claimant's

symptoms and the extent to which those symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence.[109]  Other evidence includes the claimant's

own statements, statements from the claimant's treating or nontreating physician, and others

about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to

work, and any other evidence showing how the claimant's impairments and any related

---

[107]*Id*. at pp. 262-3.

[108]*Id*. at p. 33.

[109]20 C.F.R. § 404.1529.

symptoms affect her ability to work.[110]  In evaluating the intensity and persistence of the

claimant's symptoms and determining the extent to which the claimant's symptoms limit her

capacity to work, the SSA considers the following factors:

> (i) the claimant's daily activities;
> (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;
> (iii) precipitating and aggravating factors;
> (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
> (v) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
> (vi) any measures the claimant uses or has used to relieve pain; and
> (vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.[111]

Although the ALJ did not specifically address each of these factors in his opinion, specific

consideration supports the ALJ's determination that Baty's allegations of disability are credible

only to the extent that she is limited to work in a low stress environment performing simple,

repetitive tasks with minimal contact with coworkers, supervisors or the public.  Daily activities:

According to the record, Baty lives at her mother's house with her disabled mother and her

sister's family.  She testified that she spends most of her time in her room and that she

communicates with her family by phone or by email.  She testified that she does the yard work, to

include mowing the lawn.  She reported to Monnig that she plays internet video games for about

eight hours a day.[112]  Duration and frequency of Baty's panic attacks:  The evidence about the

frequency of Baty's panic attacks varies, but the evidence indicates that Baty experiences fewer

---

[110]*See id.*

[111]*See id.*

[112]SSA record, p. 168.

panic attacks when she is taking her prescribed medication.  <u>Precipitating and aggravating</u> <u>factors</u>:  Baty testified that being around people can trigger a panic attack.[113]  <u>Medication</u>:  At the time of the hearing, Dr. Levine had prescribed Lexapro—a drug used to treat major depressive disorder and generalized anxiety disorder.[114]  Baty testified that the medication seems like it dulls her anxiety and that she planned to talk to Dr. Levine about a bigger dose.[115]  Consideration of these factors is consistent with the ALJ's credibility finding.  Baty testified that she would not be able to work, in part, because she would be in one spot for a period of time.  Yet, Baty has indicated that she spends all of her time in her room, playing internet video games and communicating with her family by email or telephone.  She suggests that her panic attacks have prevented her from keeping a job for more than 6-12 months, but most of the reasons she provided for leaving past jobs are not related to her impairment—she quit her job as a cashier because her boyfriend was going to take care of her bills,[116] she quit her job at a video store when a person she worked with was promoted and began abusing her position,[117] and she was terminated from her job as a store manager for sending personal faxes.[118]  Baty may be unable to manage a high degree of stress or constant and continuous contact with others, but Baty's limitations do not suggest that she has no ability to work.

---

[113]*Id*. at pp. 259, 268.

[114]Physician's Desk Reference 1194 (Thompson PDR 60th ed.).

[115]SSA record, p. 260.

[116]*Id*. at p. 256.

[117]*Id*. at p. 257.

[118]*Id*. at p. 259.

The final evidence in the record is the occupational expert's testimony.  The expert—Dr. Donald Marth—testified that Baty's past jobs were unskilled to semi-skilled jobs and required light to medium levels of exertion.  The ALJ posed a hypothetical question to Dr. Marth that incorporated Baty's age, her education, work experience and the ALJ's determination about Baty's residual functional capacity.  Dr. Marth testified that a such a person could perform the unskilled, light jobs of Mexican food maker by hand—300, 000 jobs regionally and more than one million nationally, cleaner/housekeeper—250 jobs regionally and more than one million nationally, laundry folder—30,000 jobs regionally and 275,000 nationally, and floral assistant—10,000 jobs regionally and 100,000 nationally.[119]  Baty complains that the ALJ failed to establish that she could perform these jobs because the Dictionary of Occupational Titles assigns a higher level of required reasoning to these jobs than is supported by Dr. Lazarus 's testimony—Dr. Lazarus testified that Baty had a marked restriction in the ability to follow detailed instructions.  The Dictionary of Occupational Titles states that the jobs which Dr. Marth testified about require detailed instructions.  Notwithstanding Dr. Lazarus's testimony, substantial evidence indicates that Baty can perform jobs requiring detailed instructions:  Dr. Chappuis assessed Baty's ability to understand and remember detailed instructions as moderately limited and her ability to carry out detailed instructions as moderately limited.[120]  Dr. Chappuis concluded that Baty retains the abilities to understand and carry out detailed noncomplex tasks.[121] Dr. Levine assessed Baty's ability to understand and remember detailed instructions as limited

---

[119]*Id*. at pp. 286-7.

[120]*Id*. at p. 173

[121]*Id*. at p. 175.

but satisfactory and her ability to carry out detailed instructions as limited but satisfactory.[122]  Dr. Boulous assessed Baty's ability to understand and remember detailed instructions as moderately limited and her ability to carry out detailed instructions as moderately limited.[123]

After reviewing the record, I conclude that substantial evidence supports the ALJ's determinations and his conclusion that Baty is not disabled under the Act–specifically, Baty's records from the CHCS, Dr. Brunson's examination of Baty, Dr. Boulous review of Baty's medical records, and Dr. Chappuis's review of Baty's medical records.

## VI.  Recommendation

Because substantial evidence supports the ALJ's determination that Baty is not disabled, I recommend that Baty's request for relief (docket entry # 3) be DENIED and that the Commissioner's decision denying Baty benefits be AFFIRMED.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[124]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate**

---

[122]*Id*. at p. 211.

[123]*Id*. at p. 143-4.

[124]28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b).

**Judge.**   A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.   A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[125]   Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[126]

   **SIGNED** on April 30, 2007.


*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[125]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[126]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).