## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **KIMBERLY D. BATY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No. SA-06-CA-0475 XR (NN)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

On this date, the Court considered the final administrative decision of the Commissioner of Social Security regarding the denial of Ms. Kimberly D. Baty's claim for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") under the Social Security Act.

### I. Factual and Administrative Background

Plaintiff filed an application, which was later amended, seeking Supplemental Security Income and Social Security Disability Insurance on September 22, 2003. Plaintiff indicated that she had been disabled since January 15, 2002.  Plaintiff has been employed as a waitress, floral assistant, assistant manager, kennel technician, cashier, and a manager of a video game store.  Plaintiff obtained an eleventh grade education.

Plaintiff's initial and reconsideration requests for benefits were denied, and she then requested a hearing before the Administrative Law Judge ("ALJ"). At the hearing, Dr. James Lazarus, medical expert witness, and Donald Marth, vocational expert witness, testified regarding the existence and classification of Plaintiff's alleged disability.

The ALJ held that Plaintiff did indeed suffer from severe impairments. These impairments were determined to be of such a nature as to inhibit Plaintiff's ability to perform work in a capacity similar to her past relevant jobs. However, the ALJ also found that Plaintiff did have the ability to perform simple, repetitive tasks in low stress environments. In so holding, the ALJ also recognized the need of Plaintiff to pursue a job that involves low levels of interaction and contact with the public. The ALJ determined that Plaintiff had the functional ability to perform a broad range of work, and that Plaintiff was not disabled.

Specifically the ALJ determined the following:1) Plaintiff is not engaged in substantial gainful activity; 2) Plaintiff's impairments of a depressive disorder, a panic disorder, and dysthymia are severe; 3) the medically determinable impairments do not meet or medically equal one of the listed impairments; 4) Plaintiff's allegations regarding her limitations are not entirely credible; 5) Plaintiff has the residual functional capacity to perform simple, repetitive tasks, in low stress environments involving minimal contact with the public, coworkers, and supervisors; 6) Plaintiff is unable to perform any of her past relevant work; 7) Plaintiff has the residual functional capacity to perform a significant range of work at any exertional level; 8) Plaintiff's non-exertional limitations do not allow her to perform the full range of work; and 9) based in part on vocational expert testimony, Plaintiff can perform a significant number of jobs in the national economy. Plaintiff instituted this action after the Commissioner of Social Security rendered the ALJ's decision final, through the denial of Plaintiff's request for review to the Appeals Council. Based on the record, Plaintiff fully exhausted her administrative remedies prior to the filing of this action.

## II. Medical History, Expert Opinions, and ALJ Conclusions

Plaintiff, according to the record, was raped by her child's father and also claims that a surveyor for an insurance company made sexual advances toward her. As a result, she asserts that if she is placed in a situation where she is the only female in the room, she will feel trapped and insecure. Plaintiff does not trust her own family members to use her food card to buy groceries, and often only communicates with her family through internet or telephone within the same residence. Plaintiff testified that she spends the vast majority of her time alone in her room where she feels it is "less chaotic".

Plaintiff testified that she is unemployed as a result of her suffering consistent panic attacks. Plaintiff further stated that at a minimum, she averages between 2 and 3 panic attacks per week. These attacks are characterized by shaking, crying, experiencing nausea, and episodes of irritable bowel. Plaintiff testified that these attacks last anywhere from 30 minutes to one hour, and that during that time she experiences a "fight or flight" feeling as though someone is going to kill her. Plaintiff asserts that this condition leads to her being unable to handle interactions with customers, thereby rendering her unable to perform the necessary functions of a cashier. Finally, Plaintiff contends that this condition has resulted in her isolating herself and also to her engaging in acts such as cutting herself and carving the word "ugly" into her leg.

Plaintiff's medical records indicate that she begin seeking mental illness treatment on June 25, 2003 at the Center for Health Care Services ("CHCS"). The physician's note found from that date indicates that Plaintiff was actually there for a follow up, but there is no independent record of any previous visit. The note indicates that at that time, Plaintiff had been taking the drug Effexor to treat major depressive disorder, which had apparently been in regression until around this time in

2003. Plaintiff was instructed to and did follow up with a physician at CHCS on July 3, 2003. The physician's notes from that day are illegible; however, there is relative certainty that she saw Dr. Eclarinal. The physician observed no cognitive deficits, and indicated Plaintiff had major depressive disorder and panic disorder. The physician increased the dose of Effexor for Plaintiff, and saw her again on September 2, 2003. Again the signature of the treating physician appears to be the same as the previous illegible one. Plaintiff complained that she had gotten divorced, could not sleep, and also that she was out of medication. This time the physician decreased her dosage of Effexor after rating her depression as a "3."[1] Plaintiff returned to CHCS again on January 16, 2004, after she had already applied for disability benefits. Plaintiff complained of panic attacks, increased depression, and she had stopped taking her medication. The healthcare professional who saw her prescribed Effexor, Prozac, and Clonazepam, and instructed her to return in four weeks.[2]

    Plaintiff's medical condition was also assessed  by Dr. Levine, her treating physician. Dr. Levine  diagnosed Plaintiff as having dysthymic disorder and panic disorder after his first visit with her on December 22, 2004.[3] Dysthymic disorder is a mood disorder that is " less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years."[4] Plaintiff complained of trouble

---

[1] Indicates the rating on a scale from 1-10, where 0 represents "no symptoms."

[2] The name of the prescribing physician is not indicated in the records. Plaintiff was rated at a "2" when her anxiety was measured. Prozac is an antidepressant and Clonazepam is a drug used to treat panic disorder.

[3] This date was eleven months after her initial application for benefits was denied. Dr. Levine is employed by the Center for Health Care Services (CHCS).

[4] Dr. Levine made a global assessment of functioning (GAF) rating of 45. Under the applicable scale, the range 41-50 indicates serious symptoms or any serious impairment in social,

sleeping, depression, suffering sex abuse as a child, drug use in the past, and an inability to keep a job more than 6 months or a year. At the conclusion of the initial visit, Dr. Levine prescribed medication as treatment. Plaintiff returned to visit Dr. Levine the next week, and then again a month later. At both of these visits, Dr. Levine rendered a determination of low anxiety and depression levels, and adjusted her medication accordingly. Plaintiff was visibly experiencing higher levels of anxiety and depression at the next meeting. She was tearful and was complaining that her sister was stealing her food stamps. Again, Dr. Levine adjusted her medication and scheduled another appointment. Plaintiff returned four months later on August 2, 2005, and reported experiencing panic attacks. Plaintiff noted that she had been off her medication for a month until she found a few pills. Dr. Levine determined that Plaintiff had low depression and anxiety levels that day; however, he also completed a mental residual functional capacity questionnaire.[5]

Dr. Levine gave Plaintiff a poor general prognosis and made the following assessments: 1) limited but satisfactory in the ability to remember work-like procedures, 2) limited but satisfactory in the ability to understand and remember very short and simple instructions, 3) limited but satisfactory in the ability to carry out very simple instructions, 4) seriously limited but not precluded in the ability to maintain attention for two hour segment, 5) no useful ability to maintain regular attendance and be punctual within customary, usually strict tolerances, 6) limited but satisfactory in the ability to sustain an ordinary routine without special supervision, 7) seriously limited but not precluded in the ability to work in coordination with or proximity to others without being unduly

_____

occupational, or school functioning. The inability to keep a job is an example of a serious impairment. Mag. Rep. and Rec. at 12.

[5]Dr. Levine assessed her depression and her anxiety both at level "2" on a scale of 10 with 0 representing "no symptoms." Her GAF rating this time was 46. *Id at* 13.

distracted, 8) limited but satisfactory in the ability to make simple work-related decisions, 9) unable to meet competitive standards in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, 10) no useful ability to perform at a consistent pace without unreasonable number and length of rest periods, 11) limited but satisfactory in the ability to ask simple questions or assistance, 12) unable to meet competitive standards in the ability to accept instructions and respond appropriately to criticism from supervisors, 13) seriously limited but not precluded in the ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, 14) unable to meet competitive standards in the ability to deal with normal work stress, and 15) limited but satisfactory in the ability to be aware of normal hazards and take appropriate precautions.

With regard to Plaintiff's ability to perform semi-skilled and skilled work, Dr. Levine determined the following: 1) limited but satisfactory in the ability to understand and remember detailed instructions, 2) limited but satisfactory in the ability to carry out detailed instructions, 3) seriously limited but not precluded in the ability to set realistic goals or make plans independently of another, and 4) limited but satisfactory in the ability to deal with stress of semi-skilled and skilled work.

Plaintiff underwent a mental status examination performed by Dr. Bradford Brunson  on November 25, 2003. Dr. Brunson noted her crying and being anxious and depressed throughout the interview. Further, Dr. Brunson found her to be in severe psychological distress, and to have an apprehensive manner and problems in attention. After observing indications of delusional thinking, Dr. Brunson diagnosed Plaintiff with Major Depressive Disorder, which was recurrent and severe with psychotic features, and also an anxiety disorder. The rating offered by Dr. Brunson placed the

Plaintiff roughly in the middle of the range for "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning" under the applicable criteria.[6] Tr. at 34. However, Dr. Brunson found no functional or physical problems in activities of daily living.

Plaintiff's medical records were also evaluated by State Agency physicians. Dr. Boulous reviewed Plaintiff's medical records and completed a psychiatric review technique form. To complete this form, Dr. Boulous rated Plaintiff's functional limitations based on the criteria for determining whether her impairments met or were medically equivalent to the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. Each section requires that the claimant have at least two marked restrictions. 20 C.F.R., pt. 404, subpt. P, appx. 1, §§ 12.04, 12.06. Dr. Boulous did not rate the Plaintiff as having a marked limitation, and therefore concluded that the medical evidence did not establish the necessary criteria. Further, Dr. Boulous concluded that the Plaintiff retains the ability to understand and carry out detailed, non-complex tasks, and to interact with coworkers and supervisors. This determination was made in the context of completing a form that requires an assessment of the claimant's mental activities with regard to her capacity to sustain a given activity over a normal workday and workweek. Dr. Boulous assessed the same mental activities that Dr. Levine did, but none of Dr. Boulous's ratings or conclusions indicated that Plaintiff was unable to work based on the applicable criteria, and therefore, he determined that Plaintiff's alleged limitations due to mental symptoms are not fully supported by the evidence.

Dr. Chappuis, another State Agency physician, also reviewed Plaintiff's medical condition, which included her initial treatment records. Like Dr. Boulous, Dr. Chappuis completed a psychiatric review technique form and a mental residual functional capacity assessment form based on the

---

[6]Dr. Brunson assessed a GAF of 55.

applicable criteria. Dr. Chappuis completed his assessment of the Plaintiff's allegations on May 14, 2004. Dr. Chappuis also concluded after his review that the Plaintiff did not have a marked limitation, and as a result, determined that the medical evidence did not fully support the existence of the Plaintiff's alleged limitations under the relevant criteria. *See* 20 C.F.R., pt. 404, subpt. P, appx. 1, §§ 12.04, 12.06. Further, Dr. Chappuis offered no rating that indicated that Plaintiff was unable to work.  Rather, Dr. Chappuis concluded that Plaintiff could understand, remember, and carry out detailed, but not complex instructions. He further determined that Plaintiff could make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting.

After denying Plaintiff's applications based on Dr. Brunson's assessment, Plaintiff was sent to Gayle Monnig, a licensed psychologist and clinical nurse specialist, for reconsideration. On May 10, 2004, Monnig diagnosed Plaintiff as having panic disorder with agoraphobia, dysthymic disorder, early onset, and cannabis abuse, full sustained remission. Monnig's rating indicated that Plaintiff had serious symptoms or serious impairment in social, occupational, or school functioning.[7] However, Monnig's report did not indicate an assessment relating to Plaintiff's capabilities beyond understanding what it meant to file for benefits and whether she could manage the benefits.

At the ALJ hearing, Dr. James Lazarus testified as a medical expert. However, he did so without the benefit of the report by Dr. Levine, and his only preparation was reviewing the medical records taken between July 3, 2003 and November 16, 2004 at CHCS. Dr. Lazarus testified that Plaintiff did not meet the criteria applicable to the assessment, and that a residual functional capacity assessment would be needed to determine if she could maintain work on a regular basis in a low

---

[7]Monnig determined that the Plaintiff had a GAP of 50.

stress environment, and perform simple, repetitive tasks with minimal public contact. In determining whether her mental impairment met section 12.04, Dr. Lazarus rated Plaintiff as follows: 1) moderate restriction of activities of daily living, 2) moderate in difficulties in maintaining social functioning, 3) moderate limitation in maintaining concentration, persistence or pace, and 4) one to two episodes of decompensation, each of extended duration. Tr. at 275-76. Dr. Lazarus further testified that her ability to play video games for upwards of 8 hours daily suggests persistence and an ability to concentrate, but did conflict with her earlier testimony. Amid a moderate rating on almost every category of his assessment, Dr. Lazarus assessed Plaintiff as having a marked restriction in the ability to follow detailed instructions.

Dr. Donald Marth also testified at the hearing in his capacity as a vocational expert. Dr. Marth testified regarding the nature of the past jobs Plaintiff had maintained successfully. Dr. Marth responded to hypothetical questions posed by the ALJ. Further, Dr. Marth offered an analysis of what, if any, occupational opportunities would exist for a person in the same or similar circumstances as Plaintiff. The vocational expert provided testimony that was relied upon in the ALJ's determination that Plaintiff was not disabled.

### III. Recommendation of the Magistrate Judge

The Magistrate Judge recommended that the determination of the ALJ is acceptable and should not be overturned. The Magistrate Judge posits that the substantial evidence requirement has been met in this case. Further, any conflict in the evidence or credibility assessments are for the Commissioner to weigh, not the court.

### IV. Statement of Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided

by 42 U.S.C. §§ 405 (g), 1383 (c)(3).

### V. Standard of Review

The Court reviews de novo those portions of the Report and Recommendation to which objection is made. *See* 28 U.S.C. § 636(b)(1).  Such a review means that the Court will examine the entire record and will make an independent assessment of the law.  However, in examining the Commissioner's decision denying disability insurance benefits, the Court is limited to a determination of whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.  *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).  In this case, Plaintiff objects on the basis of a lack of substantial evidence to support the decision of the ALJ.

"Substantial evidence is more then a scintilla, less then a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  When substantial evidence supports the Commissioner's findings, they are conclusive and must be affirmed.  *Martinez*, 64 F.3d at 173.  Four elements are weighed by the Court in determining whether the Commissioner's decision is based on substantial evidence: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work experience.  *Id*. at 174.  While a de novo review may result in the Court reaching a different ultimate conclusion, conflicts in the evidence are to be resolved by the Commissioner.  *Id*.

### VI. Evaluation Process under the SSA

The Social Security Administration has developed a five-step process to evaluate disability

claims.  20 C.F.R. §§ 404.1520, 416.920.  The first step is to determine whether the claimant is currently employed in substantial gainful activity.  If so, the claimant is not disabled. The second step is to determine whether the claimant's impairment is severe.  Only a severe impairment allows for advancement to step three.  During step three, the severe impairment is compared with a list of specific impairments.  If the claimant's impairment meets or medically equals one of the listed impairments, the plaintiff is disabled.  Otherwise, the analysis must progress to step four, at which point the Commissioner determines whether, in light of the claimant's residual functional capacity (RFC), the impairment precludes a claimant from returning to her past relevant work.  *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999).  If it is determined that the claimant cannot return to his past relevant work, the burden of proof shifts to the Commissioner during step five to show that the impairment does not prevent the claimant from performing other jobs that exist in significant numbers in the national economy, considering residual capacities, age, education, and work experience. *Id*. If the Commissioner carries this burden, the burden shifts back to the claimant to prove that he is unable to perform the alternative work. *Id*.

## VII. Legal Analysis

**A.     The ALJ did not err in affording little deference to the treating physician's opinion.**

Plaintiff contends, as her first objection to the ALJ decision, that the ALJ did not give considerable weight to her treating physician's opinion. The ALJ concluded that Dr. Levine's testimony should only be granted little weight as it was inconsistent with other substantial evidence and findings in the record. Plaintiff contends that a treating source's medical opinion, if well supported and not inconsistent with the other evidence in the record, must be given controlling weight. Plaintiff asserts that the testimony and conclusion of Dr. Levine should have been given

controlling weight as a treating source  because there is no evidence that is inconsistent with the treating source's findings. Plaintiff contends that although other medical opinions in the record do not all reach the same conclusion, they can still be reconciled and should be treated as not inconsistent with one another. Plaintiff asserts that Dr. Levine's assessment is actually consistent with the opinion of psychologist, Gayle Monnig. Monnig did in fact report a level of functioning which indicates an individual unable to sustain employment. Further, Plaintiff asserts that the opinion of medical expert, Dr. Lazarus, can be understood as not inconsistent with the testimony of Dr. Levine.

As a result of the differing medical opinions indicated in the record, the ALJ is entitled to make a determination regarding the conclusions and credibility at issue. The Court finds that there is substantial evidence in the record supporting the ALJ's determination.

Even in the event that the statements of the treating source are determined to not  be entitled to controlling weight, Plaintiff argues that the testimony of Dr. Levine should be given more deference than any of the other medical opinions. 20 C.F.R. § 404.1527 (d)(2)(I).  However, when weighing the strength of medical opinion, the ALJ should consider: 1) the length of the treatment relationship, 2) consistency with other opinions, 3) particular expertise of the treating source, 4) supportability, and 5) the nature and extent of the treatment. 20 C.F.R. §§ 404.1527 (d)(2), 416.927 (d)(2). As the Magistrate Judge correctly notes, in this case these factors weigh in favor of granting little deference to the treating source. Further, the ALJ specifically addressed these factors in coming to the conclusion. Tr. 32.

There is evidence in the record indicating that the ALJ's determination was justified. Given that other medical professionals conducted the same assessments under identical criteria, and

consistently disagreed in their conclusions with Dr. Levine, there was an adequate basis for the ALJ to adopt an opinion supported by the greater weight of evidence in his view. Medical reports, assessments, and conclusions made by Dr. Brunson, Dr. Chappuis, Dr. Boulous, and Dr. Lazarus all support the ALJ's determination that Plaintiff could perform work at any exertional level in a low stress work environment performing simple, repetitive tasks with minimal contact with others. Further, an ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995).

Although an ALJ must use caution before limiting or excluding a treating source's opinion from consideration, the rule is not absolute. As here, the lower amount of weight assigned to the treating physician's opinion can be justified on a number of grounds. First, the requirement of deference to the treating physician presupposes the existence of an extended relationship between the source and patient, which should provide the most accurate and comprehensive view point from which the ALJ should make determinations. 20 C.F.R. §§ 404.1527 (d)(2), 416.927 (d)(2). However, when the reason for the rule ceases, as in this case, then the rule too should cease because it does not have the same value in these circumstances. In contrast to this case, the deference is generally appropriate because the physician has seen the claimant multiple times, or at least enough to establish a longitudinal perspective of the claimant's impairment. In this instance, Dr. Levine only saw Plaintiff for seven months and a total of four visits, three of which consisted of 25 minutes or less. The limited nature of Dr. Levine's involvement in her comprehensive treatment becomes evident when considering his determination that the seven months he saw her were part of her 15 year history of illness. Tr. at 208. Further, deference to the treating physician has been favored largely because they are often the only expert that examined the complainant. This rule has recently

-13-

been interpreted as requiring only that in the absence of competing, first-hand, medical evidence in the record, the ALJ must consider all relevant factors in deciding how much weight to lend to a given medical opinion. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). However, in this case, that consideration does not present itself because as the record indicates, Dr. Brunson examined the Plaintiff and his findings help support the inconsistent evidence that justifies the limiting of the treating source's testimony.

Additionally, it has recently been held that in a situation, such as the instant case, where there is the presence of both internal and external inconsistencies relating to the treating source's opinion, either one, and certainly both forms of discrepancy provide a sound basis for disregarding the opinion of the treating source. *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000). Dr. Levine's opinion is inconsistent with various other medical opinions contained in the record, as well as possibly inconsistent with his own notes.

Plaintiff further contends that even if the evidence proffered by Dr. Levine is not demanding of deference, the ALJ erred in failing to contact Dr. Levine and seek clarification of the discrepancy between Dr. Levine's notes and his decisions. *Newton v. Apfel,* 209 F.3d 448, 457-58 (5th Cir. 2000). Plaintiff contends that any time the treating source's notes do not support the same conclusions as the treating source's opinion, the ALJ must make a reasonable effort to recontact the physician and clarify the basis for the opinion. 20 C.F.R. § 404.1512(e); SSR 96-5p. It is undisputed that in the instant case, the ALJ did not attempt to contact Dr. Levine for clarification, but did acknowledge inconsistency related to his opinion.

The ALJ understood the basis for the opinion of Dr. Levine, but simply chose to agree with the greater weight of the evidence in his view. *See generally, Alejandro v. Barnhart*, 291 F.Supp.

497, 513 (S.D. Tex. 2003). Even assuming that the requirement to recontact was present, and thereby unfulfilled by the ALJ, Plaintiff would still have to demonstrate prejudice resulted from the failure to recontact. *See Newton*, 209 F.3d at 458 ("Reversal, however, is appropriate only if the applicant shows prejudice from the ALJ's failure to request additional information"). Specifically, it would have to be shown that had the ALJ recontacted the treating physician it would have adduced information that would have altered the ALJ's decision. *Alejandro,* 291 F. Supp. at 512 (citing *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994); *and Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995)). Given the other evidence in the record, and the proper consideration of the relevant factors, the ALJ acted appropriately with respect to the deference afforded Dr. Levine's opinion.

**B.**   **Remand is necessary to address the explicit conflict between the testimony of the vocational expert and the Dictionary of Occupational Titles ("DOT") job requirements.**

The ALJ adopted the testimony of Dr. Lazarus "as his own." Tr. at 33.  In doing so, the ALJ implicitly accepted the determination made by Dr. Lazarus that Plaintiff suffered from a marked limitation in her ability to follow detailed instructions. Tr. at 280. Further, the ALJ relied on the testimony of the vocational expert, Dr. Marth, in determining that Plaintiff could perform a variety of jobs that are available in significant numbers in the national economy. Tr. at 34, 287-88.  The ALJ posed a hypothetical question to the vocational expert relating to the capacity of an individual with limitations similar to that of Plaintiff to perform jobs available in the economy. Tr. at 286. However, the question posed by the ALJ did not state that the hypothetical claimant had a marked limitation in the ability to carry out detailed instructions. Tr. at 286.  In response to the hypothetical question posed by the ALJ, Dr. Marth responded by stating that a person in a similar condition to that of Plaintiff could perform light, unskilled jobs such as Mexican food maker by hand, cleaner or

housekeeper, laundry folder, and floral assistant. Tr. at 286. Because this is not the type of work she could previously perform, the Commissioner must demonstrate that the jobs which he asserts she can perform now are available in significant numbers in the national economy. *Crowley*, 197 F.3d at 197-98. The four potential occupations listed by the vocational expert were represented to comprise 340,250 jobs regionally and more than 2,375,000 job opportunities nationally. Tr. at 287.

On cross-examination by the Plaintiff's attorney, the vocational expert testified that if a hypothetical job required the ability to follow detailed instructions, then a person with a markedly restricted ability to follow detailed instructions would not be able to perform that job. Tr. at 289. The DOT requirements for the jobs described by the vocational expert include the ability to follow detailed instructions.[8] Tr. at 288-90.  Dr. Marth recognized the conflict when questioned by Plaintiff's counsel, and asserted that in his view, the ability to follow detailed instructions was not necessary to perform the jobs he offered as possible alternative occupations for the Plaintiff.[9] Tr. at 289. Rather, the vocational expert made clear that he was contending that the jobs in question were simple and repetitive, the same categories of jobs that the ALJ determined to be suitable for the Plaintiff. Tr. at 289.

_____

[8]The vocational expert testified that the four jobs he offered as possible alternative occupations for Plaintiff had a "reasoning level two" according to the DOT.  "Reasoning level two" requires the ability "to apply common sense, understanding to carry out *detailed but uninvolved written or oral instructions . . . .*"  Tr. 288-90 (emphasis added).

[9]The transcript (Tr. 289) states the following regarding this issue:

Q: Okay. Can such a person [with a marked limitation in the ability to follow detailed instructions] perform a job which requires applying understanding to carry out detailed written or oral instructions? Would such a person be expected to be able to perform successfully at such a job?
A: If she had to carry out detailed, no, Sir. But I was containing [sic] that these were simple, repetitive kinds of jobs.

Contrary to the Plaintiff's assertions, if the ALJ adopted the view of Dr. Lazarus that the Plaintiff did in fact have a marked limitation with regard to her ability to follow detailed instructions, and also adopted Dr. Marth's testimony that the jobs in question did not require the ability to follow detailed instructions, there is no internal conflict within the ALJ's decision.  The only conflict is between the vocational expert's testimony relating to the skills necessary to perform the jobs, and the DOT's description of those same skills. As the record clearly indicates, the ALJ adopted the position of the vocational expert knowing that it was in direct conflict with the DOT.  Tr. at 33-35, 287-88.  Although the Plaintiff's attorney recognized the conflict and did not develop it further, the ALJ failed to do so as well.

 Specifically, the ALJ adopted the opinion of Dr. Lazarus who stated that the Plaintiff in fact had a " marked restriction" in the ability to follow detailed instructions. Tr. at 33 and 288. In the DOT, the ability to follow detailed instructions is indicated as a requirement for jobs falling within the category that the vocational expert testified the Plaintiff could perform. Tr. at 290. Further,  Dr. Marth testified as to the difficulty an individual with marked limitations relating to following detailed instructions would inevitably have in jobs within this category. Tr. at 290-93. Nevertheless, the ALJ found that the vocational expert had produced sufficient testimony to indicate that these jobs could be performed by Plaintiff and also that they were available in the national economy in significant numbers. Tr. at 35-36.

In *Carey*, the Fifth Circuit focused at length on implicit conflicts between the vocational expert's testimony and the DOT, not explicit conflicts.  *See Carey*, 230 F.3d at 146-47.  The conflict between the vocational expert's testimony and the DOT was implicit in *Carey* because it was not

addressed at the hearing and the conflicting statements were arguably reconcilable.[10]  *Id.* To the

degree that there may be an implicit conflict between a vocational expert and the DOT job

requirements, the ALJ may rely on the vocational expert's testimony provided that the record

presents an adequate basis for doing so. *Id.* at 146. In contrast, the present case involves a direct,

explicit conflict between the vocational expert's testimony and the DOT that was discussed, albeit

briefly, at the hearing before the ALJ. In *Carey*, the Fifth Circuit identified the policy consideration

in support of its holding by stating that "claimants should not be permitted to scan the record for

implied or unexplained conflicts between the specific testimony of an expert witness and the

voluminous provisions of the DOT, and then present that conflict as reversible error, when the

conflict was not deemed sufficient to merit adversarial development in the administrative hearing."

*Id.* This policy consideration is absent in the present case.  In contrast to *Carey,* the inconsistency

in this case was explicit and developed to some degree during the hearing, and it was not the result

_____

[10]In *Carey*, the plaintiff's arm had been amputated.  The DOT job requirements for
cashier or ticket taker, which the vocational expert identified a possible alternative occupations
for the plaintiff, require "handling and fingering for between one-third and two-thirds of the day,
finger dexterity in the middle third of the population, and manual dexterity within the lowest
third of the population, excluding the bottom ten percent." 230 F.3d at 145.  The Fifth Circuit
noted that "this case does not involve the type of direct and obvious conflict at issue when the
vocational expert's characterization of the exertional or skill level required for a particular job is
facially different from the exertional or skill level provided for that job in the DOT." *Id.* at 145-
46. The Fifth Circuit was "not persuaded that the facts of this case present any actual conflict
between the vocational expert's testimony and the DOT" because the DOT does not contain any
requirement of bilateral fingering ability or dexterity, and the vocational expert specifically
testified that the jobs of cashier and ticket seller could be performed with the use of only one arm
and hand. *Id.* at 146. The Fifth Circuit concluded by stating that it "surmise[d] that Carey's
argument actually reduces to a factual disagreement about whether a person with one arm can
perform a job requiring some degree of manual dexterity and fingering. The regulatory structure
as well as the controlling precedent requires expert testimony on such issues, and there is no
indication in this record that the vocational expert's testimony that Carey could perform those
jobs with one arm and hand was incorrect." *Id.*

of a post hoc review of intricate details of the DOT in search of a conflict that was not addressed by either party during the hearing. Tr. at 289-93. Furthermore, unlike *Carey*, the explicit conflict in this case between the vocational expert's testimony and the DOT job requirements is not easily reconcilable.

In dicta, *Carey* did address explicit conflict between vocational expert testimony and the DOT. In reaching it's decision in the *Carey* case, the Fifth Circuit opined that it was adopting a "middle ground" position with respect to the legitimacy of an ALJ adopting a vocational expert's testimony, when that testimony is in conflict with the DOT classifications or requirements for a particular job. *Carey*, 230 F.3d at 146. Other circuits that have adopted this middle ground position have ruled that when a clear conflict is presented, the ALJ must seek an explanation of the conflict from the vocational expert in order to obtain the substantial evidence necessary to depart from the DOT requirements. *See generally Haddock v. Apfel*, 196 F.3d 1084, 1090-92 (10th Cir. 1999); *Light v. Social Sec. Admin.*, 119 F.3d 789, 793-94 (9th Cir. 1997). Further this position is buttressed by the generally applicable duty of the ALJ to fully develop the record and establish substantial evidence of the predicate facts for his conclusions.

Further, the explicit conflict present in this case was specifically excepted in the *Carey* case. *See Romine v. Barnhart*, 454 F. Supp. 2d 623, 630-31 (E.D. Tex. 2006). Pursuant to the burden that is placed on the Commissioner in step 5 of the analysis and the ALJ's duty to fully develop the record, error was committed to the degree that the ALJ's decision and the vocational expert's disagreement with the DOT were left unexplained. *See id* at 629-31. Additionally, while Social Security rulings lack the force of law, they are persuasive. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979). In considering, these rulings as guidelines it is clear that "the adjudicator has

-19-

an affirmative responsibility to ask about any possible conflict between . . . VE . . . evidence and information provided in the DOT." *Romine*, 454 F. Supp. 2d at 627 (citing Soc. Sec. R. 00-4p, 2000 WL 1898704, at *4). The ruling further mandates that the ALJ must identify and obtain a reasonable explanation for any conflicts and explain how any conflict was resolved. *Id.*

As a result, remand is necessary to the extent that the ALJ did not explain why he adopted the vocational expert's conclusion that directly conflicted with the DOT. Alternatively, if the Court erred in describing the findings that the ALJ adopted, then the ALJ should clarify which findings he adopted and explain why no conflict exists. Specifically, if the ALJ did not adopt Dr. Lazarus' determination that the Plaintiff suffered a "marked limitation" in the ability to follow detailed instructions, but did adopt the remaining opinions offered by Dr. Lazarus, the ALJ would need to explain why he adopted some of Dr. Lazarus' medical opinions but not others.

**C.    Substantial evidence exists in the record regarding the issue of the Plaintiff's credibility, and it is within the discretion of the ALJ to make this determination.**

Finally, the Plaintiff contends that the ALJ erred in weighing the credibility of her testimony. An ALJ's findings regarding the credibility of subjective symptom testimony is "entitled to considerable judicial deference." *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983). This determination should be afforded the deference if it is supported by "substantial record evidence." *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). The Plaintiff contends that ALJ attached too much weight to her ability to engage in certain daily activities which "does not necessarily mean that she is capable of holding a job." *Orphey v. Secretary of Health and Human Services*, 962 F.2d 384, 387 (5th Cir. 1992). Conversely, the Commissioner submits that the ALJ articulated the specific reasons for discounting the credibility of the Plaintiff's subjective complaints. Further, the ALJ was

found to have considered all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R.§§ 404.1529, 416.929; SSR 96-7. The ALJ did consider the medical evidence in the record and also came to a conclusion that is directly supported by, or at least consistent with, evidence provided by the medical expert. In addition, the ALJ considered daily activities that the Plaintiff engages in. The Plaintiff is correct in her argument that simply because one can perform some daily tasks does not mean that individual is per se capable of maintaining a job. *Legget v. Chater*, 67 F.3d 558, 556 (5th Cir. 1995).

However, as a result of the proper procedural manner in which the ALJ came to the decision, and in light of the deference afforded to ALJs as persons entitled to make affirmative findings regarding subjective complaints by expressly rejecting allegations that those complaints are of disabling severity, the ALJ decision regarding the credibility should not be reversed. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). After reviewing the record in its entirety, it is evident that the ALJ considered the appropriate factors, one of which is daily activities.[11] 20 C.F.R. § 404.1529. The ALJ found these daily activities to include playing video games for upwards of eight hours per day. Tr. at 261. Further, there was evidence as to her being dismissed from previous jobs for reasons wholly unrelated to the alleged disability. For instance, the  record indicates that she was terminated from a recent position as a result of her overuse of the fax machine. Tr. at 259. Other relevant factors

---

[11]The SSA considers the following factors: 1) the claimant's daily activities, 2) the location, duration, frequency, and intensity of the claimant's pain or other symptom, 3) precipitating and aggravating factors, 4) the type, dosage, effectiveness, side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms, 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, 6) any measures the claimant uses or has used to relieve pain, and 7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

-21-

specifically addressed in making the credibility determination were the duration and frequency of Plaintiff's panic attacks, precipitating and aggravating factors, and medication. The ALJ also considered testimony and record materials submitted by the Plaintiff, medical and vocational experts, as well as treating and non-treating physicians opinions. The specificity used by the ALJ when considering the factors in relation to the complete record demonstrates that there was substantial evidence in support of the credibility determination in this case. 20 C.F.R. § 404.1529.

### VIII. Conclusion

The ALJ decision to attach little weight to the opinion of the treating source in this case was justified. The ALJ appropriately considered the opinion of the treating physician and used the appropriate factors in determining the amount of deference the opinion deserved. Further, as a result of the internal and external inconsistencies, the ALJ was supported by substantial evidence in adopting the non-treating physician's opinion.

The ALJ erred in adopting the vocational expert's testimony because it directly conflicts with the DOT job requirements.  The ALJ has an affirmative responsibility to seek a reasonable explanation of the conflict from the vocational expert in order to obtain the substantial evidence necessary to depart from the DOT requirements.

The credibility determination made by the ALJ was made after consideration of the appropriate factors, and was within his discretion based on a review of the entire record.

Accordingly, the Court SUSTAINS Plaintiff's objection to the Magistrate Judge's recommendation regarding the ALJ's inadequate step five analysis, DOES NOT ACCEPT the Magistrate Judge's recommendation, and REMANDS the Commissioner's denial of Plaintiff's application with instructions to address the explicit conflict between the testimony of the vocational

-22-

expert and the Dictionary of Occupational Titles ("DOT") job requirements. The Court

OVERRULES Plaintiff's objections regarding the remaining issues.  The Clerk is instructed to close

this case.

It is so ORDERED.

SIGNED this 13th day of June, 2007.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE